**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| TRUE 52 PRODUCTIONS LLC, an Illinois limited liability company, and JONATHAN C. SEYMOUR, *aka* "J. ALARIE," an individual, Plaintiffs, v. LAURIE L. STYRON, *aka* "ZALA MONEK," an individual, Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Case No. 1:14-cv-3407<br><br>**JURY TRIAL DEMANDED** |

**COMPLAINT**

Plaintiffs True 52 Productions LLC ("True 52") and Jonathan C. Seymour, also known as "J. Alarie" ("Seymour"), for their Complaint against Defendant Laurie L. Styron, also known as "Zala Monek" ("Styron"), allege and state as follows:

**NATURE OF ACTION**

1. This is an action under the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, for declarations of joint authorship and non-infringement pursuant to the Copyright Act of 1976, as amended, 17 U.S.C. § 101, *et seq.*, and for a declaration of member dissociation under the Illinois Limited Liability Company Act, 805 ILCS 180, *et seq*. This action also includes claims for misrepresentation pursuant to the Copyright Act of 1976, as amended by the Digital Millennium Copyright Act, 17 U.S.C. § 512, *et seq.*, and Illinois state law claims over which the court has supplemental jurisdiction because they arise out of the same case or

-1-

controversy. The state law claims include defamation, trade libel, and tortious interference with prospective business advantage

## THE PARTIES

2. True 52 is a limited liability company organized and existing under the laws of the State of Illinois. Its principal place of business is 443 West Webster Avenue, Chicago, Illinois 60614.

3. Seymour is a citizen of the State of Illinois, at all times material domiciled at 443 West Webster Avenue, Chicago, Illinois 60614. Seymour is a Member of True 52.

4. Styron is a citizen of the State of Illinois, at all times material domiciled at 2633 N. Central Park Avenue, Chicago, Illinois 60647. Styron is a former Member of True 52.

## JURISDICTION AND VENUE

5. This Court has subject matter jurisdiction over Plaintiffs' claims under 28 U.S.C. §§ 1331 and 1338(a) because the First through Fourth Claims for Relief arise under the Copyright Act of 1976, as amended, 17 U.S.C. § 101, *et seq*. This Court also has supplemental jurisdiction over the Fifth through Ninth Claims for Relief pursuant to 28 U.S.C. § 1367(a), because those claims are so related to the claims brought under the Copyright Act that they form part of the same case or controversy.

6. This Court has personal jurisdiction over Styron. Styron has continuously resided in the State of Illinois and in this District at all times material. Styron's wrongful conduct alleged herein occurred in this State and District.

7. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(a) -(c).

## GENERAL ALLEGATIONS

**True 52, "J. Alarie," and "Zala Monek"**

8. In October 2012 Seymour and Styron formed True 52 as a member-managed Illinois limited liability company for the purpose of writing, recording, publishing, and promoting musical works. On March 1, 2013, they signed the Limited Liability Company Operating Agreement for True 52 Productions LLC ("Agreement"). A true and correct copy of the Agreement is attached hereto as "Exhibit A" and made a part hereof.

9. Seymour and Styron authored their music and collateral materials under the pseudonyms "J. Alarie" and "Zala Monek," respectively.

10. As of March 1, 2013, as confirmed by Section 2.3 of and Appendix A to Exhibit A, True 52 owned all intellectual property rights in the songs entitled "The Current," "Overtaken," and "Mundane." True 52 further owned all intellectual property rights in the "collateral materials" related to those songs.

11. After March 1, 2013, Seymour and Styron assigned to True 52 all intellectual property rights in the songs entitled "Angelina," "Glitter," and "The Riverbank." Pursuant to Section 2.3 of Exhibit A, Seymour and Styron also thereupon assigned all intellectual property rights to True 52 in the collateral materials related to those songs.

12. The six songs listed in paragraphs 10 and 11 above were registered with the United States Copyright Office on October 10, 2008, under the Application Title "Zala & Alarie" and have the Registration Number SR0000730524. These six songs hereinafter are referred to as the "Registered Works."

13. True 52 has realized no profits and has made no profit distributions.

14. Styron and Seymour created musical works in addition to the Registered Works, including, but not limited to, the songs "Shelter" and "Learn to Adjust." Seymour's and Styron's

musical works in addition to the Registered Works are hereinafter referred to as the "Pending Works." True 52 and Seymour are informed and believe, and on that basis allege, that Styron has submitted Applications to the United States Copyright Office to register the copyrights in some or all Pending Works, and specifically in "Shelter" and "Learn to Adjust," disclosing only herself (as Styron or "Zala Monek") as the sole author and excluding Seymour.

15. Both Styron and Seymour exercised control over some or all of the Pending Works, specifically including "Shelter" and "Learn to Adjust," and intended to be co-authors when they were creating the works, for instance by publicly stating that the works were created by "Zala and Alarie." Any commercial and artistic success of these Pending Works depends on the contributions of both Styron and Seymour, namely the vocals and lyrics of Styron (aka Zala Monek) and the music and production of Seymour (aka J. Alarie).

16. In addition, Styron and Seymour worked together to create and/or acquire cover art, other images, and "biographies" of Zala and Alarie used to promote their music via the Zala & Alarie website (zala-alarie.com), Facebook (www.facebook.com/zala.alarie), and other media.

17. As they together explored and acted out many of the themes expressed in their musical collaborations, Styron's and Seymour's relationship became personally close and emotionally intimate. They constantly exchanged e-mail and text messages on musical and personal topics and spent countless hours together over a period of more than two years. As recently as August 26, 2013, Styron assured Seymour in writing that he was "a permanent person in [her] life" and "I am not going anywhere unless you make me. I always want to make music with you and be friends with you." However, their musical collaborations ceased and their personal relationship became dysfunctional thereafter in 2013.

**True 52 Productions Operating Agreement**

18. The Agreement (Exhibit A, Section 4.4) expresses the Members' expectations that they would together actively manage and participate in True 52's business. Each Member was required actively to collaborate in the writing, recording, publication, and promotion of music owned by True 52 and in True 52's administration and management. In addition, Styron, who is also an accountant, assumed responsibility for True 52's accounting tasks.

19. The Agreement (Exhibit A, Section 2.3) governs the contribution of intellectual property and assets to True 52. It provides, in pertinent part,

> Members will agree on songs to be published by Company. Such songs might have been created and produced by the Members in collaboration, by a Member independently, by a Member in collaboration with others, or by third parties. If, and only if, the Company has determined to publish a given song, the song shall be assigned to the Company as follows:
>
> All intellectual property rights related to the song and its collateral materials will be owned fully and wholly by the Company, unless specifically agreed otherwise in writing. However, any image bearing the identifiable likeness of any Member shall be deemed to be owned by that Member, in the event of a dissolution or the exit of that Member.

20. The term "collateral materials" in the Agreement (Exhibit A, Section 2.3) includes the collection of media supporting the promotion of True 52's music, including the images, web sites, fictional "Zala" and "Alarie" "biographies," and business cards developed by the Members or third parties for True 52. The term "identifiable likeness" in the Agreement (Exhibit A, Section 2.3) includes only those images from which a Member's actual identity can be ascertained (by visage or other unique characteristic).

21. Because the Agreement does not provide a procedure for a Member's dissociation, the unilateral right to dissociate exists in the Illinois Limited Liability Company Act, which provides that "a member of a member-managed company has the power to dissociate from a company at any time, rightfully or wrongfully, by express will" and that a member "is

dissociated" from a limited liability company upon "notice of the member's express will to withdraw upon the date of notice or on a later date specified by the member." 805 ILCS 180/35-45(1) & 35-50(a). Dissociation terminates a member's right to participate in the management and conduct of the company's business and also terminates the dissociating member's fiduciary duties as to matters arising and events occurring after dissociation. 805 ILCS 180/35-55(b).

22. Because dissociation does not extinguish a Member's distributive interest in True 52, the Agreement (Exhibit A) establishes procedures for the conveyance of the distributive interest. Upon conveyance of a Member's distributive interest, the True 52 Member will have effected the Member's "exit" from True 52. Article VII of the Agreement mandates the procedures necessary to effectuate a Member's "exit," either by sale of the distributive interest to an existing Member or third party or by a "put" of the membership interest when there is no outside buyer.

**Styron's Dissociation from True 52**

23. On or about September 13, 2013, Styron, by her statement of express will, dissociated from True 52.

24. On September 19, 2013, Styron reemphasized her September 13 dissociation from True 52 by an e-mail to Seymour.

> I need to make arrangements to remove my name from the three Wells Fargo bank accounts. . . . I called Wells Fargo on 9/13/13. They indicated that either one of us can close the accounts at any time without permission from the other . . . . I will plan to do this early next week . . . . It would be much easier for both of us if I could simply remove myself as a signer from all three accounts, but the bank unfortunately does not allow this.

25. Seymour complied with Styron's directive to remove her from True 52's bank accounts.

26. On September 24, 2013, Seymour advised Styron by e-mail that True 52 had delisted Styron as a Member of True 52 in a routine filing with the Illinois Secretary of State.

On September 25, 2013, Styron replied by e-mail to Seymour, simply, "Thank you for removing me."

27. Although Styron dissociated from True 52, she retained her distributive interest in True 52. Informal discussions between Styron and Seymour to value and convey her distributive interest in True 52 did not produce closure. Styron did not invoke the procedures of Article VII of the Agreement (Exhibit A), although Seymour specifically directed her to Article VII of the Agreement. Accordingly, although no longer a Member of True 52, Styron did not "exit" True 52 as contemplated by the Agreement.

**The Parties' Business, Artistic, and Personal Relationships Dissolve**

28. At about the same time Styron dissociated from True 52, Styron also began unwinding her artistic and personal relationships with Seymour. For instance, Styron withdrew from further consideration of a contemplated project to perform their music before a live audience and curtailed further collaboration on additional songs that were in development.

29. Styron's abandonment of True 52 and her artistic collaboration and friendship with Seymour were unwelcome to Seymour. Seymour's attempts to salvage Styron's and his business, artistic, and personal relations were ultimately rebuffed by Styron.

30. On or about November 9, 2013, a resigned Seymour wrote to Styron and invited her to meet one last time to "get closure on this." Seymour and Styron did not meet and Seymour only contacted Styron twice thereafter—an e-mail on Thanksgiving Day and a one-line text on December 3, 2013.

**Styron Campaigns Against Seymour and True 52**

31. Styron disrupted all prospects for a principled valuation of her True 52 distributive interest and an orderly exit from True 52. Her tactics involved combining her business and personal issues with True 52 and Seymour to enhance her leverage in each realm.

32. On December 10, 2013, Styron swore out an electronic harassment complaint against Seymour with the Chicago Police Department and texted Seymour's wife to report that she (Styron) had done so.

33. Although no longer a Member of True 52 and without any contractual or legal authority or right to act on behalf of True 52 or interfere in True 52's affairs, Styron from mid-November to mid-December 2013 dispatched numerous notices under the Digital Millennium Copyright Act to websites used by True 52 to promote the Registered Works. Styron's "DMCA takedown notices" achieved the removal of two joint works ("Shelter" and "Learn to Adjust") through her misrepresentations that she was the sole copyright owner in those works and that True 52 infringed her valid copyright in the same. Other DMCA takedown notices successfully suppressed cover art that constituted "collateral materials" associated with the Registered Works owned by True 52.

34. During this same time frame Styron also sent a DMCA takedown notice to the on-line music distribution site Broadjam, demanding that other collateral materials associated with the Registered Works—the "Zala & Alarie biography" and "Latest News" features—be removed.

35. In November 2013 Styron submitted a publicly-accessible post on a thread in the social media site LinkedIn's Help Center, through which users were urging LinkedIn to adopt a "block user" function. Styron's post falsely claimed she was being "stalked" by a "former

friend." Apparently dissatisfied with LinkedIn's response, Styron updated her post on December 2, 2013, with a far more pointed attack:

> UPDATE: It is now December 2nd and I still have not received a response from LinkedIn regarding the cyber-stalking I am experiencing on its web site. I am beginning to wonder if LinkedIn's business model is to attract and serve stalkers and cyber-stalkers who enjoy "anonymously" harassing and stalking their victims on an ongoing basis, preventing their victims from seeking out work and using the LinkedIn site for legitimate business purposes. I am sure this is very satisfying for sick, sociopathic people who no doubt enjoy the control they feel over their victims, preventing them from seeking out work, terrorizing them and contributing to the paranoia of "anonymous" profile views. Nice business model LinkedIn. When are you going to do something?? I contacted you on November 16th and again on November 20th and have still not received a response regarding what you plan to do to prevent Jonathan Seymour from stalking me on my LinkedIn account.

36. On December 4, 2013, Styron, through her legal counsel, delivered to True 52 and Seymour—in care of Seymour's wife, at her home *and* workplace—a formal "Cease and Desist" letter. The letter accused Seymour and True 52 of violations of the Copyright Act, the Digital Millennium Copyright Act, and other statutes by conducting the business of True 52. Styron's demands included, among other things, that True 52 and Seymour immediately and forever (i) cease the use of *all* of the cover art included in the collateral materials associated with True 52's Registered Works; (ii) cease the use of certain other Zala & Alarie promotional images that are collateral materials within the meaning of the Agreement (Exhibit A); (iii) forfeit entirely the "Zala Monek" moniker and biography that are collateral materials used to market the Registered Works; and (iv) cease the use of all songs (including "Shelter" and "Learn to Adjust"), vocals, or lyrics in works Styron and Seymour jointly created. In addition, Styron demanded $25,000 and threatened suit if no "response" to this money demand was made within 10 days of the letter.

37. On December 31, 2013—notwithstanding there had been no communications from Seymour in approximately four weeks—Styron obtained on behalf of herself and her husband an *ex parte* preliminary "no contact stalking" order of protection against Seymour from

the Cook County Circuit Court Domestic Relations Division (Case No. OP 1378395). Styron's application for the *ex parte* order accused Seymour of stalking her by viewing her public LinkedIn profile, but correctly did not accuse Seymour of having posted anything about Styron on LinkedIn (unlike Styron who posted about Seymour on LinkedIn), threatening Styron physically, calling her persistently, or appearing at Styron's home or place of business.

38. Not content merely to disrupt True 52's distribution of the Registered Works and their collateral materials by DMCA takedown notices, on or about January 1, 2014, Styron corresponded with Broadjam, accusing Seymour of sex harassment, informing Broadjam of her police report and *ex parte* no contact stalking order against Seymour, and falsely accusing Seymour of violating her alleged copyrights in the Registered Works for which True 52 was the copyright holder. Styron also demanded that Broadjam permanently delete Seymour's account and ban him from the Broadjam site.

39. Styron knew at the time of her January 2014 Broadjam correspondence that Seymour was in discussions with Broadjam to become Broadjam's chief executive officer. Styron intended by this correspondence to interfere with Seymour's Broadjam employment prospects and the enhanced distribution channel for True 52's Registered Works and associated collateral materials that Seymour's leadership of Broadjam could portend. The foreseeable and intended consequence of Styron's communications with Broadjam was that Seymour and True 52 did not achieve their prospective enhanced relationships with Broadjam. On information and belief, Styron had no independent business relationship with Broadjam and had not been invited by Broadjam to comment on Seymour's employment candidacy.

40. Finally, on January 30, 2014, Styron filed charges of employment discrimination (sexual harassment) with the Illinois Department of Human Rights against True 52 and Seymour.

Styron alleged that Seymour subjected her to sexual harassment and created a hostile and intimidating work environment for her over an 18-month period between June 2012 and December 2013 in violation of the Illinois Human Rights Act ("IHRA"), 775 ILCS 5/1-101 *et seq*. Styron knew that she had been a Member (owner) of True 52 at all times material to her charges of employment discrimination, not an employee of True 52 or Seymour. As a Member of True 52 at all times material to her charge, Styron also knew that neither True 52 nor Seymour were employers as to her. Nevertheless, Styron swore to or affirmed under penalty of perjury the particulars of her charges of employment discrimination. Her oath or affirmation was notarized by her attorney—the same attorney who authored the December 4, 2013, Cease and Desist Letter delivered to Seymour and True 52 through Seymour's wife.

41. Styron's December 4, 2013, Cease and Desist Letter also accused True 52 and Seymour of violations of the Illinois Human Rights Act.

**FIRST CLAIM FOR RELIEF**
**Declaration of Non-Infringement**
**(28 U.S.C. §§ 2201 and 2202)**

**(By True 52 and Seymour)**

42. Plaintiffs incorporate herein by reference the averments of all paragraphs preceding and following this First Claim for Relief.

43. An actual and justiciable controversy exists between Plaintiffs and Styron under the Copyright Act, 17 U.S.C. § 101, *et seq.*, concerning whether the Registered Works and/or the Pending Works (collectively, "Disputed Musical Works") infringe any valid and enforceable copyright in any musical work or any other intellectual property right purportedly owned by Styron.

44. The Registered Works and/or the Pending Works do not infringe any valid and enforceable copyright in any musical work or any other intellectual property right purportedly owned by Styron.

45. Plaintiffs are entitled to a declaration from the Court establishing that the Disputed Musical Works are not infringing any valid and enforceable copyright in any musical work or any other intellectual property right purportedly owned by Styron.

WHEREFORE, Plaintiffs respectfully request that this Court enter the following relief against Defendant:

a. Enter judgment in their favor on the First Claim for Relief;
b. Declare that the Disputed Musical Works do not infringe any valid and enforceable copyright in any musical work or any other intellectual property right purportedly owned by Styron;
c. Award Plaintiffs their costs and reasonable attorneys' fees pursuant to 17 U.S.C. § 505 and/or other applicable law; and
d. Grant such further relief as this Court may deem just and proper, in law or equity.

**SECOND CLAIM FOR RELIEF**
**Declaration of Ownership of Copyrighted Materials**
**(28 U.S.C. §§ 2201 and 2202)**

**(By True 52 and Seymour)**

46. Plaintiffs incorporate herein by reference the averments of all paragraphs preceding and following this Second Claim for Relief.

47. An actual and justiciable controversy exists between Plaintiffs and Styron concerning whether the Registered Works are solely owned by Plaintiff True 52 through assignment by Seymour and Styron and whether the Pending Works are jointly owned by Seymour and Styron.

48. The Registered Works are solely owned by Plaintiff True 52 through assignment by Seymour and Styron and the Pending Works are jointly owned by Seymour and Styron.

49. Plaintiffs are entitled to a declaration from the Court establishing that the Registered Works are solely owned by Plaintiff True 52 through assignment by Seymour and Styron and that the Pending Works are jointly owned by Seymour and Styron.

WHEREFORE, Plaintiffs respectfully request that this Court enter the following relief against Defendant:

a. Enter judgment in their favor on the Second Claim for Relief;
b. Declare that the Registered Works are solely owned by Plaintiff True 52 through assignment by Seymour and Styron, that the Pending Works are jointly owned by Seymour and Styron, and that Seymour and Styron each share an undivided interest in the Pending Works and may enforce the right to exclude others in an action for copyright infringement;
c. Award Plaintiffs their costs and reasonable attorneys' fees pursuant to 17 U.S.C. § 505 and/or other applicable law; and
d. Grant such further relief as this Court may deem just and proper, in law or equity.

### THIRD CLAIM FOR RELIEF
### Declaration of Joint Authorship of Copyrighted Materials
### (28 U.S.C. §§ 2201 and 2202)

**(By Seymour)**

50. Seymour incorporates herein by reference the averments of all paragraphs preceding and following this Third Claim for Relief.

51. An actual and justiciable controversy exists between Seymour and Styron concerning whether the Pending Works are jointly authored by Seymour and Styron pursuant to the Copyright Act, 17 U.S.C. §§ 101, 201.

52. The Pending Works are jointly authored pursuant to the Copyright Act, 17 U.S.C. §§ 101, 201, by Seymour and Styron. Both Seymour and Styron each made a substantial and

valuable contribution to the work; both Seymour and Styron intended that their contributions be merged into inseparable or interdependent parts of a unitary whole; and both Seymour and Styron each contributed material to the joint works which could have been independently copyrighted.

WHEREFORE, Seymour respectfully requests that this Court enter the following relief against Defendant:

a.    Enter judgment in Seymour's favor on the Third Claim for Relief;

b.    Declare that the Pending Works are jointly authored pursuant to the Copyright Act, 17 U.S.C. §§ 101, 201, by Seymour and Styron. ;

c.    Award Seymour his costs and reasonable attorneys' fees pursuant to 17 U.S.C. § 505 and/or other applicable law; and

d.    Grant such further relief as this Court may deem just and proper, in law or equity.

### FOURTH CLAIM FOR RELIEF
**Misrepresentation of Intellectual Property Infringement in Violation of 17 U.S.C. § 512(f) of the Digital Millennium Copyright Act**

**(By True 52 and Seymour)**

53.    Plaintiffs incorporate herein by reference the averments of all paragraphs preceding and following this Fourth Claim for Relief.

54.    Defendant knowingly and materially misrepresented in DMCA takedown notices that Plaintiffs posted allegedly infringing content on public websites.

55.    Plaintiffs were injured by these misrepresentations because their material was removed from these public websites as a consequence of Styron's misrepresentations.

56.    Plaintiffs have suffered monetary damages as a result of their outlay of resources to remedy these misrepresentations.

WHEREFORE, Plaintiffs respectfully request that this Court enter the following relief against Defendant:

a. Enter judgment in their favor on the Fourth Claim for Relief, awarding damages incurred as a consequence of Defendant's misrepresentations;

b. Award Plaintiffs their costs and reasonable attorneys' fees pursuant to 17 U.S.C. § 505 and/or other applicable law; and

c. Grant such further relief as this Court may deem just and proper, in law or equity.

## FIFTH CLAIM FOR RELIEF
### Tortious Interference with Prospective Economic Advantage
### (Common Law)

### (By Seymour)

57. Seymour incorporates herein by reference the averments of all paragraphs preceding and following this Fifth Claim for Relief.

58. By engaging in the acts pled hereinabove, Styron has engaged in wrongful conduct which was intended to and which did interfere with Seymour's prospective employment opportunity with Broadjam.

59. Styron's interference with Seymour's prospective economic advantage was willful, malicious, oppressive, and fraudulent to such an extent that an award of punitive and exemplary damages should be made against Styron and in favor of Seymour.

WHEREFORE, Seymour respectfully requests that this Court enter the following relief against Defendant:

a. Enter judgment in his favor on the Fifth Claim for Relief, awarding damages incurred as a consequence of Defendant's tortious conduct;

b. Award Seymour his costs and reasonable attorneys' fees; and

c. Grant such further relief as this Court may deem just and proper, in law or equity.

## SIXTH CLAIM FOR RELIEF
**Tortious Interference with Prospective Economic Advantage**
**(Common Law)**

**(By True 52)**

60. True 52 incorporates herein by reference the averments of all paragraphs preceding and following this Sixth Claim for Relief.

61. By engaging in the acts pled hereinabove, Styron has engaged in wrongful conduct which was intended to and which did interfere with True 52's present and future business interests in licensing and promoting its Intellectual Property to one or more Third Parties.

62. Styron's interference with True 52's prospective economic advantage was willful, malicious, oppressive, and fraudulent to such an extent that an award of punitive and exemplary damages should be made against Styron and in favor of True 52.

WHEREFORE, True 52 respectfully requests that this Court enter the following relief against Defendant:

a. Enter judgment in its favor on the Sixth Claim for Relief, awarding damages incurred as a consequence of Defendant's tortious conduct;
b. Award True 52 its costs and reasonable attorneys' fees; and
c. Grant such further relief as this Court may deem just and proper, in law or equity.

## SEVENTH CLAIM FOR RELIEF
**Declaration of Disassociation from LLC**
**(28 U.S.C. §§ 2201 and 2202)**

**(By True 52 and Seymour)**

63. Plaintiffs incorporate herein by reference the averments of all paragraphs preceding and following this Seventh Claim for Relief.

64. An actual and justiciable controversy exists between Plaintiffs and Styron concerning whether Styron dissociated by express will from membership in True 52 on or about September 13, 2013.

65. Styron did dissociate by express will from membership in True 52 on or about September 13, 2013.

66. Plaintiffs are entitled to a declaration from the Court establishing that Styron did dissociate by express will from membership in True 52 on or about September 13, 2013.

WHEREFORE, Plaintiffs respectfully request that this Court enter the following relief against Defendant:

a. Enter judgment in their favor on the Seventh Claim for Relief;
b. Declare that Styron did dissociate by express will from membership in True 52 on or about September 13, 2013;
c. Award Plaintiffs their costs and reasonable attorneys' fees; and
d. Grant such further relief as this Court may deem just and proper, in law or equity.

### EIGHTH CLAIM FOR RELIEF
**Trade Libel**

**(By True 52)**

67. True 52 incorporates herein by reference the averments of all paragraphs preceding and following this Eighth Claim for Relief.

68. By engaging in the acts pled hereinabove, Styron has published false, unprivileged, and malicious statements which were intended to and which did injure True 52 in its business and property by causing one or more persons to avoid or cease doing business with True 52. Styron's wrongful conduct constitutes the tort of trade libel against True 52.

69. Styron's trade libel was willful, malicious, oppressive, and fraudulent to such an extent that an award of punitive and exemplary damages should be made against Styron and in favor of True 52.

WHEREFORE, True 52 respectfully requests that this Court enter the following relief against Defendant:

a. Enter judgment in its favor on the Eighth Claim for Relief, awarding damages incurred as a consequence of Defendant's tortious conduct;

b. Award True 52 its costs and reasonable attorneys' fees; and

c. Grant such further relief as this Court may deem just and proper, in law or equity.

### NINTH CLAIM FOR RELIEF
**Defamation**

**(By Seymour)**

70. Seymour incorporates herein by reference the averments of all paragraphs preceding and following this Ninth Claim for Relief.

71. By engaging in the acts pled hereinabove, Styron has published false, unprivileged, and malicious statements which were intended to and which did injure Seymour in his business, property, and occupation by causing one or more persons to avoid or cease doing business with him. Styron's wrongful conduct constitutes the tort of defamation.

72. Styron's defamation of Seymour was willful, malicious, oppressive, and fraudulent to such an extent that an award of punitive and exemplary damages should be made against Styron and in favor of Seymour.

WHEREFORE, Seymour respectfully requests that this Court enter the following relief against Defendant:

a. Enter judgment in his favor on the Ninth Claim for Relief, awarding damages incurred as a consequence of Defendant's tortious conduct;

b. Award Seymour his costs and reasonable attorneys' fees; and

c. Grant such further relief as this Court may deem just and proper, in law or equity.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a trial by jury of all issues raised in the Complaint that are triable by a jury.

\*   \*   \*

Date: May 9, 2014    Respectfully submitted,

 /s/ R. Mark Halligan

**R. Mark Halligan (IL 6200723)**
rmhalligan@nixonpeabody.com
**Michael Hallerud (IL 6301353)**
hallerud@nixonpeabody.com
**Deanna R. Swits (IL 6287513)**
dswits@nixonpeabody.com

**NIXON PEABODY LLP**
300 South Riverside Plaza, 16th Floor
Chicago, IL 60606
Tel: 312-425-3900
Fax: 312-425 3909

*Attorneys for Plaintiffs True 52 Productions LLC and Jonathan C. Seymour*